### UNITED STATES DISTRICT COURT
### WESTERN DISTRICT OF LOUISIANA
### MONROE DIVISION

**CALVIN R. AUTHIER**
    **LA. DOC #404373**

**VS.**

**BURL CAIN, WARDEN, LOUISIANA
STATE PENITENTIARY**

**CIVIL ACTION NO. 5:15-cv-0108**

**SECTION P**

**JUDGE ELIZABETH E. FOOTE**

**MAGISTRATE JUDGE HAYES**

### REPORT AND RECOMMENDATION

*Pro se* Petitioner Calvin R. Authier, a prisoner in the custody of Louisiana's Department

of Corrections, filed a deficient petition for writ of *habeas corpus* pursuant to 28 U.S.C. § 2254

on January 21, 2015 [doc. # 1] and thereafter filed a corrected petition on February 11, 2015.

[doc. # 5]. Petitioner attacks his conviction for molestation of a juvenile and the life sentence

imposed by the Forty-Second Judicial District Court, DeSoto Parish. This matter has been

referred to the undersigned for review, report, and recommendation in accordance with the

provisions of 28 U.S.C. § 636 and the standing orders of the Court.

### Background

The underlying facts in this case have been set forth by the Louisiana Second Circuit

Court of Appeal as follows:

> The victim in this case is A.W.,[1] who was 11 years old at the time of the offense.
> A.W. and her younger sister, M.W., lived with their parents in Shreveport,
> Louisiana. One of A.W.'s friends was K.H., who had a 12– or 13–year–old
> brother, J.H.[2] A.W.'s mother ("Ms. W.") testified that she met K.H. and her

---

[1] In accordance with LSA–R.S. 46:1844(W), the victim is referenced only by her initials.
To further protect her privacy, all pertinent persons and/or witnesses also will be referenced by
initials.

[2] In her interview at the Gingerbread House Children's Advocacy Center, A.W. initially
stated that J.H. was 13 years old. Later in the interview, she stated that he was 12 years old.

mother ("Ms. H.") approximately three weeks prior to the offense, when the children of both families socialized at the pool at Harrah's Louisiana Downs. Thereafter, A.W. and J.H. began sending each other text messages. According to Ms. H., some of the content of the text messages was sexual in nature. For example, in one of the messages, A.W. told J.H., "I'm wet for you."

On Friday, January 15, 2010, Ms. H. and her children went to Ms. W.'s home to invite A.W. and M.W. to a slumber party at Ms. H.'s house in DeSoto Parish. According to Ms. W., J.H. hid in the car under a blanket while she and his mother talked. Ms. W. testified that Ms. H. told her that the child hiding under the blanket was her nine-year-old son, and that "he didn't like girls." Ms. W. stated that Ms. H. assured her that there would be no men or boys at the slumber party. She explained that if she had known there would be males at Ms. H's house, she would not have allowed her daughters to attend the party.

Approximately 11 people were at Ms. H.'s house on the night of the slumber party, including other girls who were not related to either family. Ms. H.'s four children were present, including J.H. and Ms. H.'s 19–year–old daughter, S.B. The defendant was S.B.'s 28–year–old boyfriend, who was also staying at the house that weekend.[3]

Ms. W. testified that A.W. called her Saturday afternoon and reported that she and her sister were having a good time and that everything "was okay." The incident that led to the defendant's arrest and subsequent prosecution occurred during the early morning hours of Sunday, January 17, 2010.

At trial, A.W. affirmed that her version of the events of that Sunday morning given at an interview at the Gingerbread House was truthful. That interview was videotaped, and the tape was played for the jury. During the interview, A.W. made the following statements:

   —at around midnight that Saturday night/Sunday morning, she went to the living room to sleep on one of the sofas;

   —the defendant entered the living room, sat on the sofa next to her and told her that he was going to rape her;

   —the defendant told her that he would kill her if she said anything;

   —the defendant called J.H. into the room and ordered J.H. to have sexual

---

[3] According to the testimony, the defendant and S.B. lived together in an apartment in Shreveport. However, they often spent weekends at Ms. H.'s home near Converse, Louisiana.

intercourse with her; the defendant stated that he would kill J.H. if he did not do so;

—when J.H. refused, the defendant punched J.H. in the face and told him to "get on top of" her;

—J.H. moved her shorts to the side and the defendant told J.H. to "put his private part in mine;"

—J.H. "got on top of" her and pretended to have intercourse; J.H. told her to act like she was hurting;

—the defendant put his hands on J.H.'s hips and pushed his hips forward, making sure that J.H. was having intercourse with her;

—during this time, J.H. told her that he was using "protection;"

—she knew that J.H. had condoms in a drawer in his bedroom because he had shown them to her the day before the incident;

—after she and J.H. engaged in intercourse for about 15 minutes, the defendant told J.H. to go take a shower;

—when J.H. left the room, the defendant sat there "playing with his private part" and then told her that it was his turn;

—the defendant called to J.H. and said that "he had been blessed;"

—the defendant moved her shorts to the side and "stuck his private part in mine;"

—when she tried to resist, the defendant burned her shoulder with a lighter;

—the defendant had both vaginal and anal intercourse with her;

—when the defendant stopped, she kicked him in the face, to which the defendant stated, "I feel no pain;"

—the defendant then forced her to "suck his private part;"

—the defendant slapped her face, scratched her arm and told her to go take a shower;

—while she was in the shower, either the defendant or J.H. removed the

shorts she had been wearing from the bathroom.

J.H. testified about his recollection of that night/early morning.[4] His testimony was as follows:

　　—he, A.W. and the defendant were in the living room while the rest of his family and their guests were in other rooms of the house;
　　—A.W. told him to go into the shower "[be]cause she wanted to go in with me;"

　　—A.W. and the defendant were on the sofa together when he left to get into the shower;

　　—A.W. never joined him in the shower;

　　—initially, J.H. testified when he returned from taking a shower, he saw A.W., but she said nothing to him. However, when reminded of a statement he had given earlier to police, J.H. testified that when he came out of the shower, A.W. was crying and she "said something about" the defendant hurting her;

　　—when he returned from the shower, he and A.W. began to have sexual intercourse while the defendant watched them and played a video game on the television;

　　—at one point, the defendant instructed him to "put her legs up or something like that;"

　　—he and A.W. had sex "all night", including anal sex;[5]

　　—A.W. consented to the act; he wore a condom.

J.H. also testified that he did not know what happened in the living room between the defendant and A.W. while he was in the shower. However, he contradicted A.W.'s statement that the defendant put his hands on his (J.H.'s) hips and forced him to have

---

　　[4] During her testimony at trial, Ms. H. testified that J.H. has a "bipolar disorder with psychotic features," post-traumatic stress disorder and attention deficit/hyperactivity disorder. According to Ms. H., J.H.'s post-traumatic stress disorder is a result of "the dysfunctional family lifestyle."

　　[5] When questioned about his knowledge of anal sex, J.H. testified that he learned about that particular sexual act from his sisters.

intercourse with A.W. J.H. testified that the defendant did not participate while he (J.H.) and A.W. were having sex and did not punch him in the face. He also testified that A.W. had sent him text messages in the past indicating "that she was sexually active." J.H. also testified with regard to a letter that he wrote to the trial judge prior to the trial. He stated that he wrote the letter with the help of—and at the request of—his sister, S.B. (the defendant's girlfriend). In the letter, J.H. stated that he and A.W. had "consensual" sex and that A.W. was "lying" about the defendant raping her.[6]

S.B. testified about the layout of the family's home. She testified that she was awake at the time of the incident and was seated in an area near the living room. At that time, the defendant was in the living room playing a video game. She stated that she "would go over there from time to time" because she wanted the defendant to finish playing the game. S.B. testified that A.W. and J.H. were "laying [sic] on the couch. I couldn't really see 'cause their heads were all the way down." She denied seeing A.W. and J.H. have sexual intercourse because "I wasn't paying attention to [them]." However, she testified that she would have known if the defendant had raped A.W. because "I was paying attention to Calvin." S.B. testified that the defendant finished playing the video game, came and watched television with her, and told her that J.H. and A.W. had been having sexual intercourse. She admitted that she really did not "know what happened back in the room." However, she stated, "If I knew he raped a little girl, I wouldn't lie for him or anyone."

The defendant testified on his own behalf. He admitted that he was present in the house on that Saturday night/Sunday morning. He testified that he walked into the living room to play a video game on the television, and he saw J.H. and A.W. having sexual intercourse. The defendant stated that he did not say anything to the children or attempt to stop them because "they really wasn't [sic] my responsibility" and "it wasn't none [sic] of my business." He testified that he proceeded to play the video game. He also stated that while he was present, J.H. left to take a shower while A.W. remained on the sofa. The defendant denied raping A.W.; he also denied forcing J.H. to have sexual intercourse with her. He testified that when he finished playing the video game, he went back to a bedroom with S.B., watched television for approximately half an hour, and went to sleep. The defendant also testified that A.W. lied about him raping her, and J.H. lied when J.H. testified that he (the defendant) instructed him (J.H.) to raise A.W.'s leg.

When A.W. and M.W. returned home that Sunday, their mother noticed that A.W. was behaving strangely and did not want to talk about the slumber party. When questioned by her mother, A.W. stated that "everything would have been fine ... Oreo started this." "Oreo" was the defendant's nickname. Upon further questioning, A.W. told her mother that the defendant had raped her.

Ms. W. contacted the Shreveport Police Department; on Monday, January 18, 2010, she

---

[6]When asked to spell the word "consensual" during the trial, J.H. was unable to do so.

spoke with DeSoto Parish Sheriff's Office Detective Garland Hensley. Detective Hensley
took their statements and arranged for A.W. to be examined by Ms. Fonda Partner, a
sexual assault nurse examiner ("SANE"). That examination, which took place on January
19, 2010, included the application of a dye to the victim's external vaginal and anal
regions. During the examination, Ms. Partner observed dye uptake around those areas,
which was consistent with recent trauma. Ms. Partner did not perform an internal
examination or swabbing; she explained that "on kids, we don't do that because [A.W.]
reported that she wasn't sexually active and that was the first time." The nurse performed
an external swab test for DNA; the examination did not yield any DNA samples. Ms.
Partner testified that a shower would "more than likely" wipe away the DNA or other
elements which would have been present if the person had not showered.

Ms. Partner also testified that A.W. told her that the defendant was the person who had
raped her, that the defendant had told her that he would kill her if she screamed, and that
he put his penis into her vagina, anus and mouth. The nurse also stated that A.W. told her
that the defendant had also forced J.H. to have sex and that J.H. had used a condom. The
nurse observed a burn on A.W.'s right shoulder and scratches on her right arm; A.W. told
the nurse that the defendant burned her with a lighter. The nurse took photographs of
those injuries; the photographs were introduced into evidence at trial.

During their investigation into A.W.'s allegations, DeSoto Parish detectives interviewed
Ms. H. and J.H. During the interview, Ms. H. told the detectives that neither J.H. nor any
other male was present in the home during the slumber party. She also reported that she
was in the house the entire weekend. However, J.H. contradicted his mother's statements
by admitting to being in the house.[7] During the trial, Ms. H. admitted that she had lied to
the officers; J.H. was at the house that weekend. Ms. H. testified that she was smoking
marijuana and was "in and out of the house" that weekend. She admitted that she
provided very little supervision of the children; she knew nothing about the events that
led up to the defendant's arrest. Ms. H. testified that she saw a burn mark on A.W.'s
shoulder. She stated that she asked J.H. about the mark, and he told her that "him and
[A.W.] had burned each other as a token of their love for each other."

By a vote of 11–1,[8] the jury convicted the defendant of molestation of a juvenile, a
responsive verdict to the charged offense of aggravated rape. The trial court denied the
defendant's motions for post-verdict judgment of acquittal and new trial. Thereafter, the
state filed a habitual offender bill of information, charging the defendant as a fourth
felony offender; and after a hearing, the court adjudicated the defendant a fourth felony

---

[7] Ms. H. was eventually arrested for and pled guilty to second offense possession of
marijuana as a result of her conduct on this weekend.

[8] The original announcement proclaimed that the verdict was 10–2; however, the polling
slips showed a verdict of 11–1.

offender. Accordingly, the court sentenced the defendant to the mandatory term of life imprisonment at hard labor without benefit of probation, parole or suspension of sentence. The defendant filed a motion to reconsider sentence which was, in content, akin to a motion for new trial. The trial court denied that motion.

*State v. Authier*, 92 So. 3d 494, 495 (La. App. 2 Cir. 2012).

The Second Circuit Court of Appeal affirmed Petitioner's conviction and sentence on April 25, 2012. *Id.* at 508. The Louisiana Supreme Court denied Petitioner's subsequent application for writ of certiorari on November 2, 2012. *State v. Authier*, 99 So. 3d 662 (La. 2012). Petitioner did not seek further direct review before the United States Supreme Court. [doc. # 5, p. 3].

On October 24, 2013, Petitioner filed an application for post-conviction relief before the Forty-Second Judicial District Court. [doc. # 1-3, p. 98]. Petitioner argued that the trial court lacked jurisdiction to adjudicate him as a habitual offender because he was never arraigned on that charge. *Id.* On October 25, 2013 the District Court denied relief relying on the procedural default codified at LA. CODE CRIM. P. art. 555 which provides for the waiver of the right to complain about irregularities at arraignment by defendants who enter upon trial without objecting thereto. [doc. # 1-4, p. 2]. The Second Circuit Court of Appeal denied relief on February 27, 2014. *Id.* at 18. The Louisiana Supreme Court denied the application on November 26, 2014, citing LA. CODE CRIM. P. art. 930.3 and *State ex rel. Melinie v. State*, 665 So. 2d 1172 (La. 1996), as well as *State v. Cotton*, 45 So. 3d 1030 (La. 2010) and *State v. Thomas*, 19 So. 3d 466 (La. 2009), indicating that the claims were not proper for post-conviction review. *State ex rel Authier v. State*, 152 So. 3d 899 (La. 2014).

Petitioner filed the instant Petition on January 21,2015. [doc. # 1]. He raises the following

claims: (1) insufficient evidence; (2) trial court erroneously denied motion for mistrial due to juror statement; (3) trial court erroneously applied rape shield law; (4) excessive sentence; and (5) trial court exceeded its jurisdiction by failing to properly arraign petitioner on the multiple offender bill. *Id.* The matter is now before the Court.

<u>Law and Analysis</u>

## I.      Standard of Review – 28 U.S.C. § 2254

The Antiterrorism and Effective Death Penalty Act ("AEDPA") of 1996, 28 U.S.C. § 2254, governs *habeas corpus* relief. The AEDPA limits how a federal court may consider *habeas* claims. After the state courts have "adjudicated the merits" of an inmate's complaints, federal review "is limited to the record that was before the state court[.]" *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011). An inmate must show that the adjudication of the claim in state court:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2).

A decision is "contrary to" clearly established Federal law "if the state court arrives at a conclusion opposite to that reached by . . . [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Dowthitt v. Johnson*, 230 F.3d 733, 740-41 (5th Cir. 2000) (quoting *Williams v. Taylor*, 529 U.S. 362 (2000)). "The 'contrary to' requirement refers to holdings, as opposed to the dicta, of . . . [the Supreme Court's] decisions as of the time of the relevant state-court decision." *Id.* at 740. Under the "unreasonable application" clause, a federal *habeas* court

8

may grant the writ only if the state court "identifies the correct governing legal principle from . . . [the Supreme Court's] decisions but unreasonably applies the principle to the facts of the prisoner's case." *Id.* at 741.

Section 2254(d)(2) speaks to factual determinations made by the state courts. Federal courts presume such determinations to be correct; however, a petitioner can rebut this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

## II.     Petitioner's Claims

A. Claim One: Insufficient Evidence

Petitioner claims that the evidence presented at trial was insufficient to find him guilty of the charged crime. [doc. # 1, p. 2]. When a habeas petitioner asserts that the evidence presented was insufficient to support his conviction, the limited question is whether the state appellate court's decision to reject that claim was an objectively unreasonable application of the clearly established federal law set out in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Williams v. Puckett*, 283 F.3d 272, 278-79 (5th Cir. 2002). A conviction is based on sufficient evidence if, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319. The *Jackson* inquiry "does not focus on whether the trier of fact made the correct guilt or innocence determination, but rather whether it made a rational decision to convict or acquit." *Herrera v. Collins*, 506 U.S. 390, 402 (1993). Thus, a conviction may rest on sufficient evidence "even though the facts also support one or more reasonable hypotheses consistent with the defendant's claim of innocence." *Gibson v. Collins*, 947 F.2d 780, 783 (5th Cir. 1991).

Here, invoking *Jackson*, the Second Circuit Court of Appeal began review by referencing

the pertinent definition of molestation of a juvenile found in LA. REV. STAT. § 14:81.2:

> Molestation of a juvenile is the commission by anyone over the age of seventeen of any lewd or lascivious act upon the person or in the presence of any child under the age of seventeen, where there is an age difference of greater than two years between the two persons, with the intention of arousing or gratifying the sexual desires of either person, by the use of force, violence, duress, menace, psychological intimidation, threat of great bodily harm, or by the use of influence by virtue of a position of control or supervision over the juvenile. Lack of knowledge of the juvenile's age shall not be a defense.

*Authier*, 92 So. 3d at 501.  The appellate court then set forth the relevant testimony and evidence presented at trial:

> In the instant case, at the time of the offense, the defendant was 28 years-old; A.W. was 11 years old. A.W.'s testimony was replete with facts that were, if believed by the trier of fact, sufficient to prove the elements of this offense. A.W. testified that the defendant told her that he would kill her if she screamed and then proceeded to put his penis into her vagina, anus and mouth. She also stated that when she attempted to resist, the defendant burned her shoulder with a lighter, slapped her and scratched her arm. Clearly, the defendant's conduct was intended to gratify his sexual desires. Under the plain meaning of sufficiency, A.W.'s testimony alone was sufficient to prove the offense of molestation of a juvenile beyond a reasonable doubt.

> Applying *Jackson*, the Second Circuit held that the evidence presented was "sufficient to support the defendant's conviction." *Id.* at 502. The court reasoned:

> The jury was presented with different versions of the events of the night in question. After considering the evidence, the jury made a rational decision to convict the defendant of molestation of a juvenile. Although the witnesses gave varied explanations of the events that occurred on January 17, 2010, the jury was made fully aware of the motives each witness might have had to fabricate their testimony. The victim's testimony did not include statements that were inconsistent with the physical evidence, nor did it contain any significant internal inconsistencies. A.W.'s account of the events was essentially unwavering, from her initial report to her mother, to her statement to the detectives, to her statement to the SANE nurse, to her statement to the interviewer at the Gingerbread House, to her testimony at trial.

*Id.* at 501-02. A review of the trial record shows that the appellate court's application of *Jackson*

was objectively reasonable. This claim is without merit and should be **DENIED**.

B. Claim Two: Erroneous Denial of Motion for Mistrial Due to Juror Statement

Petitioner claims that the trial court erred in denying his motion for mistrial when one of the jurors expressed a negative opinion about a witness at trial. [doc. # 1, p. 5]. Presumably, Petitioner contends that the court violated LA. CODE CRIM. PROC. art. 775, which states, in pertinent part, "[u]pon motion of a defendant, a mistrial shall be ordered, and in a jury case the jury dismissed, when prejudicial conduct in or outside the courtroom makes it impossible for the defendant to obtain a fair trial . . . ." A mistrial is a "drastic remedy" in Louisiana. *State v. Mark*, 146 So. 3d 886, 903 (La. App. 4 Cir. 2014) (citations omitted). Determining "'whether a mistrial is warranted[] lies within the sound discretion of the trial judge, and this decision will not be overturned on appeal absent an abuse of that discretion.'" *Id.* (quoting *State v. Wessinger*, 736 So. 2d 162, 183 (La. 1999)).

This claim does not involve consideration of any federal or constitutional law. "Federal habeas corpus relief will not issue to correct errors of state constitutional, statutory, or procedural law unless a federal issue is also presented." *Leblanc v. Quarterman*, 2008 WL 2330746 at *6 (N.D. Tex. May 28, 2008); *West v. Johnson*, 92 F.3d 1385, 1404 (5th Cir. 1996). Rather, "[f]ederal habeas corpus review is limited to errors of constitutional dimension . . . ." *Castillo v. Johnson*, 141 F.3d 218, 222 (5th Cir. 1998). In the course of reviewing state proceedings, a federal court does not sit as a super state appellate court. *Dillard v. Blackburn*, 780 F.2d 509, 513 (5th Cir. 1986). Here, consequently, review of Petitioner's claim is not proper.

To the extent that Petitioner's claim can be construed as asserting a claim for denial of due process, the claim is without merit. A denial of a motion for mistrial or a failure to admonish

11

only implicates the Constitution if the error results in a fundamental unfairness that fatally infects

the trial. *Matthews v. Cain*, 2010 WL 3210444, at *16 (E.D. La. July 12, 2010) (citing *Lisenba v.*

*California*, 314 U.S. 219, 236-37 (1941)); *see also Webb v. Blackburn*, 773 F.2d 646, 651-52

(5th Cir. 1985) (emphasizing that the inquiry is whether a denial of mistrial "rendered the trial

fundamentally unfair in the constitutional sense."). A petitioner must show that "the trial court's

error had a 'substantial and injurious effect or influence in determining the jury's verdict.'"

*Hernandez v. Dretke*, 125 Fed. App'x 528, 529 (5th Cir. 2005) (citing *Brecht v. Abrahamson*,

507 U.S. 619, 623 (1993)).

Here, the record reflects that the juror's knowledge of the witnesses did not have a

prejudicial effect on the verdict. The appellate court noted that the juror "affirmed that her

knowledge of the witnesses would not affect her ability to serve as a juror and would not affect

her opinion of the defendant's guilt or innocence. The trial judge, who had the opportunity to see

the witness and observe her demeanor . . . accepted her responses as true." In light of the

overwhelming evidence against Petitioner, the Court finds that the trial court's decision not to

grant a mistrial did not fatally infect the fairness of Petitioner's trial or have a substantial and

injurious effect on the jury's verdict. This claim should be **DENIED**.

C. Claim Three: Erroneously Applied Rape Shield Law

Next, Petitioner claims that his Sixth Amendment constitutional right to confrontation

was violated because the state court did not allow him to cross-examine the victim about her past

sexual activity. [doc. # 1-2 p. 32].

On October 4, 2010, the defendant filed a motion to introduce evidence of the victim's

past sexual behavior pursuant to LA. CODE EVID. ANN. art. 412. *State v. Authier*, 92 So. 3d 494,

505 (La. App. 2 Cir. 2012). The defendant argued that he was entitled to present evidence that

A.W. and J.H. engaged in consensual sexual intercourse one week prior to January 17, 2010. *Id.*.

The trial court found that it was a premature effort to bolster the credibility of J.H. and that the

alleged consensual intercourse did not occur within the 72–hour time limit prior to the offense, as

required by  LA. CODE EVID. ANN. art. 412(B)(1). *Id.* However, the trial court stated that "it's

very possible during cross-examination, that thin line you walk down, it could open the door

wide open. But we'll cross that when we get to it." *Id.* The issue was subsequently raised again

and another evidentiary hearing was held. The trial court ruled:

> The issue has become as to whether there is evidence of other sexual relations of
> the alleged victim in this case were admissible for impeachment purposes. The
> State's position was that 412 prohibits that introduction of that evidence and after
> reviewing the case law, that is the ruling of the Court that as the record exists right
> now based upon the evidence we have to this point is that no such evidence is
> admissible. The Court is very mindful that this is a delicate balance of protecting a
> victim of a sexual assault from opening up entire sexual history versus the
> defendant's right of confrontation and in particular impeachment, but as I stated,
> the Court's ruling is that such evidence is not admissible. That is evidence of
> sexual relationships with anyone other than this defendant.

*Id.*

The right to present a complete defense under the Sixth Amendment "is an essential

attribute of the adversary system . . . ." *Taylor v. Illinois*, 484 U.S. 400, 408 (1988). "However,

this right is limited and must be weighed against the countervailing interests in 'the integrity of

the adversary process . . . the interest in the fair and efficient administration of justice, and the

potential prejudice to the truth-determining function of the trial process.'" *U.S. v. Mizell*, 88 F.3d

288, 294 (5th Cir. 1996) (citing *Taylor*, 484 U.S. at 414-15). The federal Fifth Circuit has stated

that "[t]he Confrontation Clause does not guarantee defendants cross-examination to whatever

extent they desire." *Kittelson v. Dretke*, 426 F.3d 306, 319 (5th Cir. 2005) (quoting *Bigby v.*

*Dretke*, 402 F.3d 551, 573 (5th Cir. 2005). Rather, a trial court judge has discretion "to impose reasonable limits on cross-examination based on concerns about harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Id.* at 320 (quoting *Davis v. Alaska*, 415 U.S. 308 (1974)). "[R]ules excluding evidence from criminal trials . . . do not abridge an accused's right to present a defense so long as they are not arbitrary or disproportionate to the purposes they are designed to serve." *U.S. v. Scheffer*, 523 U.S. 303, 308 (1998); *see also U.S. v. John*, 597 F.3d 263, 277 (5th Cir. 2010) ("[T]he accused . . . must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence."). In *Nevada v. Jackson*, 133 S. Ct. 1990, 1992 (2013), the Supreme Court stated that it has rarely "held that the right to present a complete defense was violated by the exclusion of defense evidence under a state rule of evidence."

Before granting relief based on a violation of the Confrontation Clause, the court must apply harmless error analysis. *Kittelson*, 426 F.3d at 319 (citing *United States v. Stewart*, 93 F.3d 189, 194 (5th Cir. 1996)). On federal habeas review, the harmless error standard is governed by *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993), which prohibits relief unless the constitutional error had a "substantial and injurious effect or influence in determining the jury's verdict." There must be "more than a mere reasonable possibility that it contributed to the verdict." *Woods v. Johnson*, 75 F.3d 1017, 1026 (5th Cir. 1996) (citing *Brecht* 507 U.S. at 637).

Here, the trial court clearly determined that there was no constitutional error to this effect. First, the purpose of the rape shield law codified in LA. CODE EVID. ANN. art. 412 is to protect the victim and prevent prejudicial evidence of the victim's past sexual behavior from being

admitted to imply a willingness on the victim's part to engage in the sexual acts that are the basis of the prosecution. Second, the scope of the cross-examination which was disallowed in this case was extremely narrow, with little or no relevance to the juvenile molestation charge Petitioner faced.

Additionally, under the standard set forth in *Brecht v. Abrahmson*, it is clear that the excluded evidence did not have a "substantial and injurious effect or influence" on the verdict. As noted *supra*, the victim's account of the events were "essentially unwavering, from her initial report to her mother, to her statement to the detectives, to her statement to the SANE nurse, to her statement to the interviewer at the Gingerbread House, to her testimony at trial." *State v. Authier*, 92 So. 3d 494, 502 (La. App. 2 Cir. 2012). Moreover, during the examination of the victim a day after the incident, the SANE nurse observed dye uptake around the victim's external vaginal and anal regions, which was consistent with recent trauma. Thus, this minimal limitation on Petitioner's right to cross-examine the victim did not constitute constitutional error. The state court's decision denying relief on this issue was neither contrary to nor an unreasonable application of federal law. This claim should be **DENIED**.

### D. Claim Four: Excessive Sentence

Petitioner's next claim alleges that the sentence imposed by the trial court–life in prison at hard labor without benefit of probation, parole or suspension of sentence–was excessive under the facts and circumstances of this case. [doc. # 1-2, p. 35]. He argues that his sentence is excessive and disproportionate under *State v. Dorthey*, 623 So. 2d 1276 (La. 1993).

A state's interpretation of its own laws or rules provides no basis for federal habeas

15

corpus relief, because no question of a constitutional nature is involved. *See Williams v. Foti*, 813 F. 2d 700 (5th Cir. 1987); *Carrizales v. Wainwright*, 699 F.2d 1053, 1055 (11th Cir. 1983); *Llama-Almaguer v. Wainwright*, 666 F.2d 191, 193 (5th Cir. 1982). Accordingly, "federal courts do not review a state's failure to adhere to its own sentencing procedures . . . ." *Nichols v. Estelle*, 556 F.2d 1330, 1331 (5th Cir. 1977), *cert. denied*, 434 U.S. 1020 (1978); *see also Martinez v. Johnson*, 255 F.2d 229, 246 (5th Cir. 2001). "This limitation on federal habeas review is of equal force when a petition, which actually involves state law issues, is 'couched in terms of equal protection and due process.'" *Branan v. Booth*, 861 F.2d 1507, 1508 (11th Cir. 1988) (quoting *Willeford v. Estelle*, 538 F.2d 1194, 1196-98 (5th Cir. 1976)).

To the extent petitioner is arguing that his sentence is excessive under Louisiana law or that the trial judge erred in following the state sentencing guidelines, that claim is not cognizable in this federal proceeding. Federal *habeas corpus* relief is available only for violations of federal constitutional law, and this Court does not sit to review alleged errors of state law. *Narvaiz v. Johnson*, 134 F.3d 688, 695 (5th Cir. 1998). Accordingly, this Court will not review the state court's findings regarding the constitutionality of petitioner's sentence under state law.

Moreover, federal *habeas* courts must accord wide discretion to a state trial court's sentencing decision. *Haynes v. Butler*, 825 F.2d 921, 923 (5th Cir. 1987) (citations omitted). However, relief may be required where a petitioner can show that his sentence is outside the statutory limits or is wholly unauthorized by law. *Id*. at 923-24. If a sentence is within the statutory limits, as here, a petitioner must show "that the sentencing decision was wholly devoid of discretion or amounted to an 'arbitrary or capricious abuse of discretion' . . . or that an error of law resulted in the improper exercise of the sentencer's discretion and thereby deprived the

petitioner of his liberty." *Id.* at 924 (citations omitted).

Petitioner was convicted of molestation of a juvenile and sentenced to life imprisonment at hard labor, without benefit of parole, probation, or suspension of sentence. Petitioner contends that the sentence imposed was excessive for the following, *inter alia*, reasons: the two prior burglary offenses occurred before he reached the age of 21; his felony theft conviction occurred three years prior to the instant offense and resulted in a sentence of only one year; and his prior felonies were nonviolent in nature. [doc. # 1-2, p. 39]. According to the appellate court, however, the trial court considered Petitioner's reasons. *Authier*, 92 So. 3d at 507. The trial court also considered the habitual offender sentencing guideline in LA. REV. STAT. § 15:529.1(A)(4)(b). [doc. # 16-2, p. 108]. Both courts determined that the serious nature of Petitioner's actions, his long criminal history, his lack of employment history, and the habitual offender statute all supported the sentence imposed.[9] *Id.* at 205-06; *Authier*, 92 So. 3d at 507-08.

The undersigned finds that the state courts' determinations do not amount to arbitrary or capricious abuses of discretion. As the appellate court noted, "[t]he nonviolent nature of the instant or past crimes may not solely form the evidence which justifies rebutting the presumption of constitutionality; the lack of violence cannot be the main reason for declaring such a sentence excessive." *Authier*, 92 So. 3d at 508. For these reasons, Petitioner's sentence was not unconstitutionally excessive, and his fourth claim should be **DENIED**.

D. Claim Five: Failure to Arraign for Habitual Offender Bill

In Petitioner's final claim he alleges that the trial court lacked subject matter jurisdiction

---

[9] LA. REV. STAT. § 15:529.1(A)(4)(b).

to adjudicate him as a multiple offender because he was never properly arraigned for the habitual offender proceeding. [doc. # 1-2, p. 41]. The Second Circuit Court of Appeals and the Louisiana Supreme Court expressly relied on well established state procedural rules in declining to reach the merits of the claim. [docs. # 1-4, p. 17-18;  # 1-5, p. 69-70]. The Louisiana Supreme Court and Second Circuit Court of Appeals both specifically cited *State ex rel. Melinie v. State*, 665 So. 2d 1172, and *State v. Cotton*, 45 So. 3d 1030. *State ex rel Authier v. State*, 152 So. 3d 899 (La. 2014);  [doc. # 1-4, p. 17-18; doc. # 1-5, p. 69-70]. The Louisiana Supreme Court also cited LA. CODE CRIM. PROC. art. 930.3 as the basis for the default, which sets forth the exclusive grounds for post-conviction relief under Louisiana law and makes no provision for contesting sentencing error. *Authier*, 152 So. 3d at 899. In *Melinie*, the Louisiana Supreme Court held, "LA. CODE CRIM. PROC. art. 930.3, which sets out the exclusive grounds for granting post-conviction relief, provides no basis for review of claims of excessiveness or other sentencing error post-conviction." *Melinie*, 665 So. 2d at 1172. In *Cotton*, the Court reasoned, "An habitual offender adjudication . . . constitutes sentencing for purposes of *Melinie* and LA.C.CR.P. art. 930.3, which provides no vehicle for post-conviction consideration of claims arising out of habitual offender proceedings . . . ." *Cotton*, 45 So. 3d at 1030. In other words, the Louisiana Courts, applying Louisiana law, refused to reach the merits of Petitioner's sentencing claim since it was raised in an application for post-conviction relief.

Generally, a federal court will not review a question of federal law decided by a state court if the decision of that state court rests on a state ground that is both independent of the federal claim and is adequate to support that judgment. *See Glover v. Cain*, 128 F.3d 900, 902 (5th Cir. 1997). This "independent and adequate state law" doctrine applies to both substantive

and procedural grounds and affects federal review of claims that are raised on either direct or *habeas* review. *Amos v. Scott*, 61 F.3d 333, 388 (5th Cir. 1995). Procedural default does not bar federal court review of a federal claim raised in a *habeas* petition unless the last state court to render a judgment in the case has clearly and expressly indicated that its judgment is "independent" of federal law and rests on a state procedural bar. *Glover*, 128 F.3d at 902. A state court expressly bases its denial of relief on a state procedural default even if it alternatively reaches the merits of a defendant's claim. *See Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989). Similarly, to be "adequate," the state procedural rule must be strictly or regularly followed and evenhandedly applied to the majority of similar cases.  *Id.*

Here, as mentioned, the Louisiana Supreme Court relied on LA. CODE CRIM. PROC. ANN. art. 930:3, *State ex rel. Melinie* and *Cotton*  in denying Petitioner's claims. It is well settled that Article 930.3 and the cited cases are independent and adequate state grounds for dismissal barring federal habeas corpus review. *See, e.g.*, *Hull v. Stalder*, 234 F. 3d 706 (5th Cir. 2000); *Johnson v. Cain*, 2012 WL 5363327, at *4 (E.D. La. Oct. 30, 2012) (Article 930.3, *State ex rel. Melinie* and *Cotton* are independent and adequate); *Taylor v. Cain*, 2008 WL 4186883, at *16 (E.D. La. Sept. 10, 2008); *Evans v. Cain*, 2012 WL 2565008, at *6–7 (E.D. La. Mar. 14, 2012), report adopted by, 2012 WL 2565001, at *1 (E.D. La. Jul. 2, 2012); *Neal v. Kaylo*, 2001 WL 1195879, at *5 (E.D. La. Oct. 10, 2001) (Article 930.3 and *State ex rel. Melinie* are independent and adequate). Accordingly, it appears that Petitioner's claim is immune from federal review.

A petitioner, however, may be excepted from the procedural default rule if he can show "cause" for his default and "prejudice attributed thereto," or demonstrate that the federal court's failure to review the defaulted claim will result in a "fundamental miscarriage of justice."

*Coleman v. Thompson*, 501 U.S. 722 (1991); *Wainwright v. Sykes*, 433 U.S. 72 (1977); *Glover*, 128 F.3d at 902. To establish cause for a procedural default, a petitioner must demonstrate that some objective factor external to the defense impeded his efforts to comply with the state's procedural rule. *Murray v. Carrier*, 477 U.S. 478, 488 (1986). The mere fact that the petitioner failed to recognize the factual or legal basis for a claim, or failed to raise the claim or objection despite recognizing it, does not constitute cause for a procedural default. *Id.* at 486.

Here, Petitioner has not offered any cause for the default that would excuse the procedural bars imposed by the trial court. Nor does this Court's review of the record reveal any factor external to the defense that prevented Petitioner from properly objecting. In the same way, a review of the record does not reveal any external condition that prevented Petitioner from raising his claim in a procedurally proper manner. The record does not reflect any action or inaction on the part of the State which prevented Petitioner from properly objecting to the "trial court error" in a procedurally correct manner.

"The failure to show 'cause' is fatal to the invocation of the 'cause and prejudice' exception, without regard to whether 'prejudice' is shown." *Hogue v. Johnson*, 131 F.3d 466, 497 (5th Cir. 1997). Having failed to show an objective cause for his default, the Court does not need to determine whether prejudice existed.

Petitioner's claim is thus procedurally barred from review absent a showing that a fundamental miscarriage of justice will occur if the merits of the claim are not reviewed.  *Hogue*, 131 F.3d at 497. To establish a fundamental miscarriage of justice, Petitioner must provide this Court with evidence that would support a "colorable showing of factual innocence." *Kuhlmann v. Wilson*, 477 U.S. 436, 454 (1986). To satisfy the factual innocence standard, Petitioner must

20

show that "but for constitutional error, no reasonable fact-finder would have found the applicant guilty of the underlying offense." *Nobles v. Johnson*, 127 F.3d 409, 423 (5th Cir. 1997).

Petitioner makes no real argument that a fundamental miscarriage of justice will occur if his claims are not reviewed by this Court or that suggests his actual innocence on the underlying conviction. Accordingly, Petitioner has failed to overcome the procedural bar to the Petitioner's post conviction claim concerning his habitual offender proceeding. The claim is procedurally barred and should be **DISMISSED**.

<u>**Conclusion**</u>

For the reasons stated above, **IT IS RECOMMENDED** that the Petition for writ of *habeas corpus* filed by Petitioner Harold W. Johnson, [doc. # 1], be **DENIED and DISMISSED WITH PREJUDICE**.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule 72(b), parties aggrieved by this Recommendation have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **fourteen (14) days** after being served with a copy of any objections or response to the District Judge at the time of filing. A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing. Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR,**

**FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

Pursuant to Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts, this Court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant. Unless a Circuit Justice or District Judge issues a certificate of appealability, an appeal may not be taken to the court of appeals. **Within fourteen (14) days from service of this Report and Recommendation, the parties may file a memorandum setting forth arguments on whether a certificate of appealability should issue.** *See* 28 U.S.C. § 2253(c)(2). **A courtesy copy of the memorandum shall be provided to the District Judge at the time of filing.**

In Chambers, Monroe, Louisiana, this 11th day of September, 2015.

KAREN L. HAYES
UNITED STATES MAGISTRATE JUDGE